UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 1:06 CR 558 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHANIE ACIERNO, | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |

Pending before the court is Defendant Stephanie Acierno's ("Defendant") Motion to Suppress the written statement that she gave to FBI agents on October 4, 2006. (ECF No. 17.) Defendant is accused of conspiring with Alan Kessler ("Kessler") to cause someone to travel in interstate commerce into the State of Ohio with intent that the murder of Christopher Acierno (Defendant's husband) be committed in violation of the laws of the State of Ohio. (*See* Indictment, ECF No. 12.) On February 26, 2007, the court held a hearing on Defendant's Motion. For the reasons set forth below, Defendant's Motion to Suppress is denied.

## I. FACTUAL BACKGROUND

On October 4, 2006, Defendant left her home at approximately 7:30 a.m. to attend nursing school clinicals at Austinburg Rehabilitation in Ashtabula County, Ohio. Defendant left her four year old son and nearly two year old daughter, with her boyfriend, Kessler. Defendant had recently left her allegedly abusive husband.

The previous day, on October 3, 2006, Defendant had met with an undercover FBI agent posing as a hitman, going by the pseudonym "Bob." Defendant showed Bob a photograph of her estranged husband, Christopher Acierno, whom she and Kessler wanted killed. Either Defendant or Kessler came up with the idea to have Christopher Acierno struck on the head and placed on a railroad track to be murdered. The murder was to occur that same night, October 3.

On October 4, 2006, Defendant returned home from Austinburg Rehabilitation because she had forgotten her wallet. Upon reaching her home, Defendant was surprised that Kessler and her children were not there. Kessler had already been arrested by the FBI that morning, sometime after Defendant left home. Defendant grew increasingly worried over the absence of Kessler and her children and began to panic. Defendant testified that she believed her husband had taken or injured her children and Kessler. Defendant phoned her grandparents to ask whether they had heard from Kessler. They had not. Defendant then called the Ashtabula Police Department. The Ashtabula officers who responded to Defendant's call were initially unaware that Defendant was a suspect in a federal criminal investigation of a murder for hire.

While en route to Defendant's work location, FBI Agent Robert McBride ("Agent McBride") observed Defendant outside her residence speaking with Ashtabula police officers. Agent McBride asked one of the Ashtabula detectives was riding with him to have the responding officers escort Defendant to the police station. Defendant was not handcuffed or read *Miranda* warnings at this time. According to Defendant, she was asked to come down to the police station to make a statement regarding her missing children.

Defendant was introduced to Agent McBride and Agent Russ Csaszar ("Agent Csaszar") at the police station. Agents McBride and Csaszar testified at the evidentiary hearing that Defendant

-2-

was immediately advised by Agent McBride that her children were safe and that they wanted to talk to her about another matter. Defendant testified that the agents told her that they did not know where her children were and that she continued to ask about her children for fifteen minutes into the interview. Agent Csaszar testified that he read Defendant *Miranda* rights from a preprinted form at the beginning of the interview and asked her to read along with him. (*See* Pl.'s Ex 1.) Defendant testified that she was only handed the form and told to read and sign it. Defendant signed the acknowledgment and waiver, and agreed to be questioned by the agents.

Thereafter, Agent McBride asked Defendant about her relationship with her husband and her pending divorce. The agents informed Defendant that they had apprehended a male outside Christopher Acierno's home whom they believed was involved in a plot to kill Christopher. Defendant was then asked if she knew any reason why anyone might want to kill Christopher Acierno. She indicated she did not. The agents continued to interrogate Defendant regarding the reasons why someone would want to murder Christopher Acierno, to which she again gave negative responses. The agents then told her that "Bob" had been caught and was accusing Defendant of wanting to murder Christopher. Defendant denied knowing "Bob" or meeting "Bob" at her residence. Eventually, the agents told Defendant that Kessler had also told the FBI that Defendant wanted her husband murdered. Defendant said that Kessler would be lying if he said that she had planned to murder her husband.

When the agents informed her that "Bob" also told them that he had been to her house, she finally admitted that "Bob" had come by her house to look at photos. After stating that they knew that Defendant was lying, the agents played a tape of a conversation allegedly between Alan Kessler and "Bob," as well as a videotape of a meeting between Kessler and "Bob." Defendant responded,

"You are probably now going to tell me that 'Bob' is an FBI agent." Agent McBride then affirmed that, indeed, "Bob" was an FBI agent. Thereafter, Defendant decided to cooperate and made a statement. Agent McBride and Agent Csaszar both testified that Defendant never asked for a lawyer or asked whether or not she needed a lawyer anytime during questioning. However, Defendant testified that she did ask whether she needed a lawyer and that she had stated that she did not think she should make a written statement without a lawyer.

Agent McBride testified that he asked Defendant to provide a written statement to tell her side of the story and provide some insight to the prosecutor. Defendant agreed to write a statement. Agent McBride also testified that he told Defendant that he could not make any promises regarding leniency for her cooperation. However, Defendant testified that Agent McBride told her she had to cooperate so that he could help her with the prosecutor. Defendant was left alone in the room to write and explain the events which led to her eventual arrest. Thereafter Defendant wrote and signed the statement which she now seeks to have suppressed. (*See* Def.'s Ex. B.)

## II. LAW AND ANALYSIS

Defendant first argues that her written statement should be suppressed because no *Miranda* warnings were provided to her when the FBI agents first began to interrogate her. (Def.'s Mot. 6.) *Miranda* requires that when an individual is taken into custody and subjected to questioning, in order to protect the Fifth Amendment privilege against self-incrimination, a defendant must be warned that she has the right to remain silent, and that anything she says can be used against her in a court of law. *See Miranda v. Arizona*, 384 U.S. 436 ( 1966). A defendant must also be told that she has the right to the presence of an attorney, and if she cannot afford an attorney one will be appointed for her prior to any questioning if she so desires. *Id.*

As an initial matter, the government indicated at the hearing that it does not contest that Defendant was in custody when Agents McBride and Csaszar began questioning her. Defendant argues that Agents McBride and Csaszar "persisted in a charade that 'they did not know where her children were' to be able to continue to interrogate [her]." (Def.'s Mot. 6.) However, at the hearing, Agents McBride and Csaszar both testified that Defendant was read her *Miranda* rights by Agent Csaszar prior to the agents questioning her. Defendant signed the "Advice of Rights" form and it was witnessed by both Agent McBride and Agent Csaszar. (*See* Pl.'s Ex. 1.) Additionally, Agent McBride and Agent Csaszar both testified that they advised Defendant that her children were safe before they began to interrogate her. The court finds their testimony credible on these issues. Therefore, this court does not find that Defendant's rights were violated.

Next, Defendant argues that the FBI agents continued to interrogate her, after she requested the assistance of counsel. The Supreme Court has made clear that custodial interrogation must cease until an attorney is present if the accused requests counsel. *See Miranda*, 384 U.S. at 474; *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). Though Defendant testified that she requested counsel prior to drafting her written statement, Agent McBride and Agent Csaszar both testified that Defendant did not request the assistance of counsel at any time during the interrogation. Because the court credits the testimony of the agents on this issue, this court finds that Defendant's right to counsel was not violated.

Finally, Defendant argues that her written statement was involuntary because it was the product of coercion. (Def.'s Mot. 8.) Voluntariness is established by the totality of the circumstances surrounding the statement. *Arizona v. Fulminante*, 499 U.S. 279 (1991). A statement is involuntary only if there is police coercion or overreaching which overbears the individual's will

and causes the statement to be made. *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002). Defendant argues that she was brought to the interrogation under false pretenses and that the FBI agents failed to inform her that they knew her children were safe, while attempting to elicit information from her. (Def.'s Mot. 8-9.) Defendant also argues that the FBI agents told her that the only way they could help her is if she cooperated, and that she had not had anything to eat or drink prior to making the statement.

Given the finding by the court above that Agents McBride and Csaszar told Defendant near the beginning of the interview that her children were safe, that she was read her *Miranda* rights prior to questioning, and that she did not ask for a lawyer during questioning, the court concludes that Defendant's statement was not involuntary or the product of coercion. Additionally, Agent McBride's telling the Defendant that providing a written statement might assist in having the prosecutor understand her story was not coercive or such as to make her statement involuntary.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is denied. (ECF No. 17.)

IT IS SO ORDERED.

/s/*SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

March 12, 2007